IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19-cr-20302-MSN-tmp |
| ) | |
| TECARLIOUS HEARN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**REPORT AND RECOMMENDATION**

Before the court by order of reference is defendant Tecarlious Hearn's Motion to Suppress. (ECF Nos. 36-37.) For the reasons below, it is recommended that the motion be denied.

I. **PROPOSED FINDINGS OF FACT**

The following proposed findings of fact are based on evidence presented at the suppression hearing, including testimony from Memphis Police Department ("MPD") Officers Brian Barnes and Christopher Tracy, both of whom testified credibly. The undersigned admitted four exhibits: a disc containing audio recordings of a 911 call and subsequent police dispatch transmission; an MPD arrest ticket and police report from June 29, 2019; audio-video recordings taken from Officers Barnes and Tracy's body-worn cameras ("body cam"); and a police incident report documenting a prior domestic violence altercation involving

Hearn and the mother of his child, Acacia Harden, that occurred on May 29, 2019. (ECF No. 54.)

The events that gave rise to the charges against Hearn in the present case occurred on June 29, 2019. At just before 1:30 p.m., Acacia Harden called 911 to report a domestic dispute:

> Dispatch Officer: Memphis 911. You need police, fire, or ambulance?
>
> Harden: The police.
>
> Dispatch Officer: Where do you need police at?
>
> Harden: 3482 Lamphier Avenue. Memphis, Tennessee.
>
> Dispatch Officer: 3482 Lamphier?
>
> Harden: Yes.
>
> Dispatch Officer: What's going on there?
>
> Harden: My kid's father. He is not supposed to be around me. He just got out of jail for domestic violence and he is trying to start back acting up and I am not trying to be hit on.
>
> Dispatch Officer: Is he there now?
>
> Harden: Yes.
>
> Dispatch Officer: What's his name?
>
> Harden: Tecarlious Hearn.
>
> Dispatch Officer: Spell his first name, ma'am.
>
> Harden: T-E-C-A-R-L-I-O-U-S.
>
> Dispatch Officer: Okay, you said T-E-C?
>
> Harden: A-R-L-I-O-U-S.
>
> Dispatch Officer: And you said, Hines? H-I-N-E-S?

>  Harden: No, ma'am. Hearn. H-E-A-R-N.
>
>  Dispatch Officer: What is he wearing?
>
>  Harden: White t-shirt and jeans.
>
>  Dispatch Officer: Any weapons involved?
>
>  Harden: No, ma'am.
>
>  Dispatch Officer: What is your name?
>
>  Harden: Acacia Harden.
>
>  Dispatch Officer: Okay, we will get the police out there.

(ECF No. 54 Ex. 1.)

The dispatch officer relayed this information to Officers Barnes and Tracy over the radio, telling them, "3482 Lamphier. Acacia Harden is the complainant involving her child's father who was just released from jail for domestic violence. Going to be a male black wearing a white t-shirt and blue jeans. 3482 Lamphier Ave." (Id.) The dispatch officer did not mention on the broadcast that Harden had stated no weapons were involved.

Officer Tracy was familiar with the residence because a month earlier, on May 29, he had responded to a domestic violence call at this same location. (ECF No. 54 Ex. 4.) On that occasion, Officer Tracy saw blood on the front steps when he arrived at the residence, and according to the police report, officers forced entry and "observed more blood near the entrance to the restroom." (Id.) Officer Tracy later learned that Harden had been admitted to the hospital with injuries. According to the police report,

"[Harden] advised she dialed 911 from her cell phone and put the phone in her pocket when [Hearn] started wrestling with her to get her phone. [Harden] advised [Hearn] started hitting her and that she can't remember if she hit him back. [Harden] advised [Hearn] took her phone and saw where she had already called police. [Harden] advised [Hearn] began hitting her several times in the head. Officers observed abrasions and swelling to [Harden's] right eye." (Id.)

Within five minutes of receiving the June 29 call from dispatch, the officers arrived at 3482 Lamphier Avenue.[1] The officers exited their patrol vehicle and walked towards the house. (ECF No. 54 Ex. 3 at 1:00.) When they were about halfway up the driveway, they heard someone yelling and what sounded like slapping coming from inside the house.[2] (Id. at 1:08-1:10.) Believing an assault was taking place, the officers rushed to the front entrance, which had a glass screen door that was closed and a solid front door that was slightly ajar. (Id.) Officer Tracy drew his weapon, opened the screen door, and entered the house. (Id. at

---

[1] Officer Tracy's body cam began recording audio when he stepped out of the patrol car, while Officer Barnes's body cam did not capture any audio until after the officers entered the house. (ECF No. 54 Ex, 3.) Because the officers' body cam recordings substantially overlap, the undersigned will reference the timestamps from Officer Tracy's body cam recording.

[2] The officers' testimony about what they heard as they walked up the driveway is corroborated by Officer Tracy's body cam recording, in which the yelling and slapping sounds can be heard clearly.

1:14.) Inside, the officers found a man wearing a white t-shirt and jeans, later identified as Hearn, sitting on a couch in the front living room holding a cellphone to his ear. (Id. at 1:16.) Another man was standing in the living room holding a pair of shoes. Below is a still image taken from Officer Tracy's body cam depicting what he saw when he first entered the residence:³



(Id. at 1:21.)

The officers yelled at Hearn to drop his weapon. (Id.) Looking surprised and confused, Hearn responded that he did not have a weapon. (Id.) Hearn put the phone back to his ear, telling the person on the other end of the call, "The police over here. What are you talking about? You're talking like you're going to beat somebody up? The police over here, why?" (Id. at 1:18-1:32.) The

---

³Hearn is the man with the white shirt sitting on the couch in the bottom right corner of the still image. For privacy reasons, the undersigned has obscured the image of the other man's face, as he was not involved with any criminal conduct.

- 5 -

officers lowered their weapons and told Hearn to stand up. (Id. at 1:23-1:28.) Hearn complied by standing up and raising his hands above his head. (Id. at 1:34.) Officer Tracy immediately patted him down for weapons. (Id. at 1:35.) Finding none, Officer Tracy ordered Hearn to go stand next to the other man. (Id. at 1:40.)

As he started walking with his hands still above his head, Hearn stated to the officers, "Look, there is a weapon in the house, can I show you where it is at?" (Id. at 1:42.) Officer Tracy responded, "No, I don't care about that right now." (Id. at 1:45.) Hearn followed up by asking Officer Tracy what was happening. (Id. at 1:49.) At this point, the officers told Hearn and the other man that they could "relax" and sit down. (Id. at 1:54.) In response to Officer Tracy asking if he had any proof of identification, Hearn told the officers his name and repeated that he had a weapon in the house. (Id. at 1:56.) Before Hearn could sit down, Officer Barnes pulled his arms behind his back and Officer Tracy placed him in handcuffs. (Id. at 2:04-2:11.) Officer Barnes then asked Hearn about Harden's whereabouts. (Id. at 2:20.) Hearn told them that she had just left. (Id. at 2:21.) Hearn also told the officers that he had just been released from jail and that he had been involved in numerous encounters with the police. (Id. at 2:37-4:40.)

In the meantime, Officer Barnes searched the house for other individuals and found a child in one of the bedrooms. When he

returned, Officer Barnes told the other man to call Harden and have her return to the residence. (Id. at 2:46.) The man called Harden and then handed the phone to Officer Tracy, who told Harden that they needed her back at the residence. (Id. at 3:26-4:27.) Officer Tracy explained to Hearn that they entered the house because they heard yelling and screaming. (Id. at 4:54-5:03.)

About one minute later, Officer Tracy asked Hearn, "So there's a weapon in the house, where's the weapon?" (Id. at 6:04.) Hearn, who was still in handcuffs, motioned towards the couch. (Id. at 6:05-6:07.) Officer Tracy recovered a loaded assault rifle hidden under a pillow in the couch. (Id. at 6:33.) As Officer Tracy was securing the rifle, Hearn said, "I like the way you handle that. You look like me with that thing." (Id. at 6:50.) According to the officers' body cam recordings, approximately five minutes elapsed between when the officers first entered the home and when they recovered the rifle.

On October 31, 2019, Hearn was indicted by a federal grand jury of being a convicted felon in possession a firearm in violation of 18 U.S.C. § 922(g)(1), and of possessing a firearm after having been convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. § 922(g)(9). (ECF No. 1.)

## II.   PROPOSED CONCLUSIONS OF LAW

**A.   Warrantless Entry**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. It is well established that "a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." United States v. Trice, 966 F.3d 506, 512 (6th Cir. 2020) (citation omitted). "'Exigent circumstances' are one such exception." Johnson v. City of Memphis, 617 F.3d 864, 868 (6th Cir. 2010) (citing Mincy v. Arizona, 437 U.S. 385, 390 (1978)). "Exigent circumstances are situations where real, immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." Howell v. McCormick, No. 3-15-cv-1428, 2017 WL 6359885, at *3 (M.D. Tenn. Dec. 13, 2017) (citing United States v. Phillips, 931 F. Supp. 2d 783, 793 (E.D. Mich. 2013)). Under this exception, "[o]fficers . . . have an indisputable right 'to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists.'" Tobias v. Pletzke, 933 F. Supp. 2d 892, 911 (E.D. Mich. 2013) (quoting Georgia v. Randolph, 547 U.S. 103, 118 (2006)). "A court must consider 'the totality of the circumstances and the inherent necessities of the situation' when determining the existence of exigent circumstances." United States v. Joy, No. 13-20180-STA-tmp, 2014 WL 288936, at *14 (W.D. Tenn. Jan. 27, 2014) (quoting United States

v. Plavcak, 411 F.3d 655, 663 (6th Cir. 2005)). The government has the burden of proving that it was objectively reasonable for the police to believe that somebody in the home was either "seriously injured or threatened with such injury." Michigan v. Fisher, 558 U.S. 45, 47 (2009) (per curium) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

The undersigned finds that the officers' warrantless entry into the Lamphier residence was justified because they reasonably believed somebody inside was either being harmed or threatened with imminent harm. In making this determination, the court considers "two dispositive factors consistently found in these cases . . . [:] a potential for injury to the officers or others and the need for swift action." United States v. Huffman, 461 F.3d 777, 785 (6th Cir. 2006) (citing Stuart, 547 U.S. at 406-07; Thacker v. City of Columbus, 328 F.3d 244, 252–55 (6th Cir. 2003); United States v. Holloway, 290 F.3d 1331, 1334–40 (6th Cir. 2002); and United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994)). The officers arrived at the house shortly after receiving a dispatch call advising them of a domestic disturbance, the nature of which is "without question potentially volatile and dangerous." United States v. Humphrey, No. 06-20356-B, 2007 WL 1341356, at *5 (W.D. Tenn. May 4, 2007). They were told the "child's father was just released from jail for domestic violence." This was the same residence where, just a month earlier, Officer Tracy had responded

- 9 -

to a domestic violence call during which he observed blood on the front doorstep and bathroom, and the same victim, Harden, had to be hospitalized when Hearn hit her after discovering she had called 911. The officers heard yelling and slapping sounds coming from inside as they approached, and under the circumstances, were justified in rushing inside to prevent "real immediate and serious consequences." Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir. 2002) (quoting O'Brien v. City of Grand Rapids, 23 F.3d 990, 997 (6th Cir. 1994)). The fact that Harden was not actually inside the house and that nobody was being harmed does not negate the reasonableness of the officers' actions. See Huffman, 461 F.3d at 785 ("The warrantless entry, moreover, may not be held unconstitutional simply because the reasonable concerns of the officers were not substantiated after-the-fact."); Holloway, 290 F.3d at 1340 ("The fact that no victims are found, or that the information ultimately proves to be false or inaccurate, does not render the police action any less lawful."). Because the officers had "good reason to believe a domestic violence threat exist[ed]," United States v. Coffelt, No. 1:12-cr-115, 2013 WL 1837947, at *4 (E.D. Tenn. Apr. 2, 2013) (citing Randolph, 547 U.S. at 118), their warrantless entry was lawful.

Once inside, the officers were justified in patting down Hearn for officer safety. A police officer may "perform a precautionary search — known as a 'frisk' or 'pat down' — whenever he or she has

- 10 -

'reasonable suspicion' that the person searched may be armed and dangerous." United States v. Pachecho, 841 F.3d 384, 390 (6th Cir. 2016) (citing Knowles v. Iowa, 525 U.S. 113, 118 (1998)). "Ultimately, the test is whether 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'" Id. (quoting United States v. Noble, 762 F.3d 509, 521-22 (6th Cir. 2014)). Officer Tracy knew about the prior domestic assault incident between Hearn and Harden, was notified that Hearn had just been released from jail for domestic violence, and heard yelling and slapping coming from inside the residence. Officer Tracy conducted the safety frisk within seconds of entering the residence. Although Harden had informed the 911 dispatcher that no weapons were involved, that information was not relayed on the broadcast transmission to the officers. But even if that information had been transmitted, under the totality of the circumstances, the officers would have still been justified in conducting a safety frisk for their own protection. See United States v. McMullin, 739 F.3d 943, 947 (6th Cir. 2014) (holding that officers were justified in frisking a burglary suspect despite being told that they were frisking the wrong person because the encounter occurred within "a matter of seconds" of the officers arriving on the scene and the officers still reasonably feared for their own or others' safety). Moreover, the officers were justified in searching the house for individuals

who might need immediate medical attention or protection from imminent harm.[4] See Stuart, 547 U.S. at 403 ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.").

**B.   Statements About Firearm**

As articulated by the Supreme Court in Miranda v. Arizona, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Since Miranda, the Supreme Court has summarized its central principle as follows: "if the police take a suspect into custody and then ask him questions without informing him of [his] rights . . . his responses cannot be introduced into evidence to establish his guilt." Berkemer v. McCarty, 468 U.S. 420, 428 (1984).

"In determining whether a defendant was subject to custodial interrogation we look to the totality of the circumstances 'to determine how a reasonable [person] in the suspect's position would

---

[4]It is worth noting that no firearms (or any other evidence) were found during the frisk of Hearn or the search of the rooms for other individuals. Rather, the firearm at issue was found as a result of Hearn's statements about the presence of a weapon in the house.

- 12 -

have understood the situation.'" United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003) (quoting United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998)). "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (internal citation and quotation omitted). However, "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda." Howes v. Fields, 565 U.S. 499, 509 (2012). A suspect who does not feel free to terminate an encounter is only in custody for purposes of Miranda if "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." United States v. Howard, 815 F. App'x 69, 78-79 (6th Cir. 2020) (quoting Fields, 565 U.S. at 509).

The Sixth Circuit has set out four factors to consider when determining if a suspect is in custody: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." United States v. Luck, 852 F.3d 615, 621 (6th Cir. 2017) (quoting United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010)). Further, "an important factor underlying Miranda was the interrogator's goal of 'isolating the suspect in unfamiliar surroundings for no purpose other than to

subjugate the individual to the will of his examiner. . . . These concerns simply do not apply to most in-home interrogations.'" United States v. Panak, 552 F.3d 462, 467 (6th Cir. 2009) (quoting Beckwith v. United States, 425 U.S. 341, 346 & n.7 (1976)).

Additionally, "'[v]olunteered statements of any kind are not barred by the Fifth Amendment . . .'" Rhode Island v. Innis, 446 U.S. 291, 300 (1980) (quoting Miranda, 384 U.S. at 478); see also United States v. Ortkiese, 208 F. App'x 436, 440 (6th Cir. 2006) (finding no Fifth Amendment violation when defendant voluntarily made incriminating statements to police officers as he sat on his living room couch while the officers searched his home); United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (finding no Fifth Amendment violation when defendant made incriminating statement that he owned a gun discovered by police officers because police did not ask defendant any questions about gun ownership or possession and took no actions that were likely to elicit an incriminating response); United States v. Murphy, 107 F.3d 1199, 1205 (6th Cir. 1997) (finding no Fifth Amendment violation when defendant made voluntary, incriminating statements in a police car after he was escorted to the police car outside his home and left in it for a few minutes while he could be identified).

It is undisputed that the officers did not inform Hearn of his Miranda rights before discovering the firearm. However, Miranda warnings were not required because Hearn's initial

statements about the firearm were made spontaneously and, in any event, he was never subjected to custodial interrogation. Hearn made his first statement about the firearm ("Look, there is a weapon in the house, can I show you where it is at?") as he was walking to the back of the living room, and in response, Officer Tracy told him, "No, I don't care about that right now." He made his second statement about the firearm ("My name is Tecarlious Hearn. There is a weapon in the house.") in response to being asked for his identification. These statements were made on Hearn's own accord and without any prompting by either officer. See United States v. Bailey, 407 F. App'x 27, 29 (6th Cir. 2011) ("Because Bailey made the comment about the gun without being questioned, the statement was admissible and the motion to suppress was properly denied."). These statements were "spontaneous and unprovoked," therefore they did not trigger Miranda protections and are not subject to suppression. Cole, 315 F.3d at 637.

As for Hearn's statement in response to Officer Tracy's later question asking where the gun was located ("The weapon is right there, right up under there."), the Fifth Amendment is likewise not implicated because Hearn was not in custody. The entire encounter occurred in Hearn's living room. See Luck, 852 F.3d at 621 ("To begin, defendant was questioned in his home, a fact that typically weighs against being 'in custody.'") (quoting Panak, 552 F.3d at 466); Cooper v. Yukins, 533 F.3d 477, 486 (6th Cir. 2008)

("While an interrogation in one's home is not determinative alone of the custodial inquiry, it is usually indicative of the absence of the isolation inherent in custodial interrogations."). Hearn made the statements about the firearm and it was recovered within five minutes of the officers lawfully entering the house. See United States v. Abdi, No. 19-1782, 2020 WL 5542884, at *5 (6th Cir. Sept. 16, 2020) (defendant not in custody for non-accusatory and routine questions posed "in the first minute of the interaction"); Luck, 852 F.3d at 621 (an hour-long interrogation was "not lengthy by our standards"). Although Hearn was in handcuffs, the officers had explained to him that they were there to investigate a domestic disturbance call and did not suggest in any way that he was under arrest. Under the circumstances, Hearn was neither in custody nor placed in a situation that was tantamount to an arrest and, thus, his Fifth Amendment rights were not violated. And, because the statements did not run afoul of Miranda, the officers' seizure of the firearm would not constitute the fruit of any unlawfully obtained statement.

### III. RECOMMENDATION

For the reasons above, the undersigned recommends that Hearn's Motion to Suppress be denied.

Respectively submitted,

        s/ Tu M. Pham
        TU M. PHAM
        Chief United States Magistrate Judge

<u>March 16, 2021</u>
Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**