IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                              Case No. 2:19-cr-20302-MSN

TECARLIOUS HEARN,

    Defendant.
_____

ORDER ADOPTING REPORT AND RECOMMENDATION
AND
DENYING DEFENDANT'S MOTION TO SUPPRESS
_____

Before the Court is Chief Magistrate Judge Pham's Report and Recommendation ("Report") entered March 16, 2021 (ECF No. 63). The Report recommends that Defendant's Motion to Suppress ("Motion") be denied. Defendant filed his objections to the Report on March 30, 2021 (ECF No. 66). The Government filed a response to Defendant's objections on April 5, 2021 (ECF No. 67). For the reasons set forth below, Defendant's objections are **OVERRULED**, and Defendant's Motion is **DENIED**.

**STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and recommendation. "The magistrate judge must promptly conduct the required proceedings and enter on the record a recommendation for disposing of the matter, including any proposed findings of fact." Fed. R. Crim. P. 59(b)(1). If a party files timely objections to the recommendation, the district court must consider those objections *de novo* and "accept, reject, or modify the

recommendation." Fed. R. Crim. P. 59(b)(3). Failure to object to a magistrate judge's findings or conclusions results in waiver of those objections. Fed. R. Crim. P. 59(b)(2).

"The filing of objections to a magistrate [judge]'s report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). Therefore, objections to a magistrate judge's report must be "specific." Fed. R. Crim. P. 59(b)(2). Vague, general, or conclusory objections are improper, will not be considered by the reviewing court, and are "tantamount to a complete failure to object." *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001); *see also Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("[A] general objection to a magistrate [judge]'s report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious."); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004) ("An 'objection' that does nothing more than state a disagreement with a magistrate [judge]'s suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context.")  The Court need not review—under a *de novo* or any other standard—those aspects of a report and recommendation to which no objection is made. *Thomas v. Arn*, 474 U.S. 140, 150–52 (1985).

## **FINDINGS OF FACT**

Neither Defendant nor the Government submitted objections to the proposed findings of fact set forth in the Report. (*See* ECF No. 66 at PageID 94; ECF No. 67 at PageID 97–98.) The Court therefore **ADOPTS** the Report's proposed findings of fact, set forth in part[1] below:

---

[1] Although this Court includes only part of the Report's proposed findings of fact herein, this Court is adopting all of the Report's proposed findings of fact.

2

The events that gave rise to the charges against Hearn in the present case occurred on June 29, 2019. At just before 1:30 p.m., Acacia Harden called 911 to report a domestic dispute:

Dispatch Officer: Memphis 911. You need police, fire, or ambulance?

Harden: The police.

Dispatch Officer: Where do you need police at?

Harden: 3482 Lamphier Avenue. Memphis, Tennessee.

Dispatch Officer: 3482 Lamphier?

Harden: Yes.

Dispatch Officer: What's going on there?

Harden: My kid's father. He is not supposed to be around me. He just got out of jail for domestic violence and he is trying to start back acting up and I am not trying to be hit on.

Dispatch Officer: Is he there now?

Harden: Yes.

Dispatch Officer: What's his name?

Harden: Tecarlious Hearn.

Dispatch Officer: Spell his first name, ma'am.

Harden: T-E-C-A-R-L-I-O-U-S.

Dispatch Officer: Okay, you said T-E-C?

Harden: A-R-L-I-O-U-S.

Dispatch Officer: And you said, Hines? H-I-N-E-S?

Harden: No, ma'am. Hearn. H-E-A-R-N.

Dispatch Officer: What is he wearing?

Harden: White t-shirt and jeans.

Dispatch Officer: Any weapons involved?

Harden: No, ma'am.

3

>Dispatch Officer: What is your name?
>
>Harden: Acacia Harden.
>
>Dispatch Officer: Okay, we will get the police out there.

(ECF No. 54 Ex. 1.)

The dispatch officer relayed this information to Officers Barnes and Tracy over the radio, telling them, "3482 Lamphier. Acacia Harden is the complainant involving her child's father who was just released from jail for domestic violence. Going to be a male black wearing a white t-shirt and blue jeans. 3482 Lamphier Ave." (Id.) The dispatch officer did not mention on the broadcast that Harden had stated no weapons were involved.

Officer Tracy was familiar with the residence because a month earlier, on May 29, he had responded to a domestic violence call at this same location. (ECF No. 54 Ex. 4.) On that occasion, Officer Tracy saw blood on the front steps when he arrived at the residence, and according to the police report, officers forced entry and "observed more blood near the entrance to the restroom." (Id.) Officer Tracy later learned that Harden had been admitted to the hospital with injuries. According to the police report, "[Harden] advised she dialed 911 from her cell phone and put the phone in her pocket when [Hearn] started wrestling with her to get her phone. [Harden] advised [Hearn] started hitting her and that she can't remember if she hit him back. [Harden] advised [Hearn] took her phone and saw where she had already called police. [Harden] advised [Hearn] began hitting her several times in the head. Officers observed abrasions and swelling to [Harden's] right eye." (Id.)

Within five minutes of receiving the June 29 call from dispatch, the officers arrived at 3482 Lamphier Avenue. The officers exited their patrol vehicle and walked towards the house. (ECF No. 54 Ex. 3 at 1:00.) When they were about halfway up the driveway, they heard someone yelling and what sounded like slapping coming from inside the house. (Id. at 1:08-1:10.) Believing an assault was taking place, the officers rushed to the front entrance, which had a glass screen door that was closed and a solid front door that was slightly ajar. (Id.) Officer Tracy drew his weapon, opened the screen door, and entered the house. (Id. at 1:14.) Inside, the officers found a man wearing a white t-shirt and jeans, later identified as Hearn, sitting on a couch in the front living room holding a cellphone to his ear. (Id. at 1:16.) Another man was standing in the living room holding a pair of shoes. . . .[2]

. . .

The officers yelled at Hearn to drop his weapon. (Id.) Looking surprised and confused, Hearn responded that he did not have a weapon. (Id.) Hearn put the phone back to his ear, telling the person on the other end of the call, "The police

---

[2] The Report includes a still image taken from Officer Tracy's body cam depicting what he saw when he first entered the residence.

4

over here. What are you talking about? You're talking like you're going to beat somebody up? The police over here, why?" (Id. at 1:18-1:32.) The officers lowered their weapons and told Hearn to stand up. (Id. at 1:23-1:28.) Hearn complied by standing up and raising his hands above his head. (Id. at 1:34.) Officer Tracy immediately patted him down for weapons. (Id. at 1:35.) Finding none, Officer Tracy ordered Hearn to go stand next to the other man. (Id. at 1:40.)

As he started walking with his hands still above his head, Hearn stated to the officers, "Look, there is a weapon in the house, can I show you where it is at?" (Id. at 1:42.) Officer Tracy responded, "No, I don't care about that right now." (Id. at 1:45.) Hearn followed up by asking Officer Tracy what was happening. (Id. at 1:49.) At this point, the officers told Hearn and the other man that they could "relax" and sit down. (Id. at 1:54.) In response to Officer Tracy asking if he had any proof of identification, Hearn told the officers his name and repeated that he had a weapon in the house. (Id. at 1:56.) Before Hearn could sit down, Officer Barnes pulled his arms behind his back and Officer Tracy placed him in handcuffs. (Id. at 2:04-2:11.) Officer Barnes then asked Hearn about Harden's whereabouts. (Id. at 2:20.) Hearn told them that she had just left. (Id. at 2:21.) Hearn also told the officers that he had just been released from jail and that he had been involved in numerous encounters with the police. (Id. at 2:37- 4:40.)

In the meantime, Officer Barnes searched the house for other individuals and found a child in one of the bedrooms. When he returned, Officer Barnes told the other man to call Harden and have her return to the residence. (Id. at 2:46.) The man called Harden and then handed the phone to Officer Tracy, who told Harden that they needed her back at the residence. (Id. at 3:26-4:27.) Officer Tracy explained to Hearn that they entered the house because they heard yelling and screaming. (Id. at 4:54-5:03.)

About one minute later, Officer Tracy asked Hearn, "So there's a weapon in the house, where's the weapon?" (Id. at 6:04.) Hearn, who was still in handcuffs, motioned towards the couch. (Id. at 6:05-6:07.) Officer Tracy recovered a loaded assault rifle hidden under a pillow in the couch. (Id. at 6:33.) As Officer Tracy was securing the rifle, Hearn said, "I like the way you handle that. You look like me with that thing." (Id. at 6:50.) According to the officers' body cam recordings, approximately five minutes elapsed between when the officers first entered the home and when they recovered the rifle.

On October 31, 2019, Hearn was indicted by a federal grand jury of being a convicted felon in possession a firearm in violation of 18 U.S.C. § 922(g)(1), and of possessing a firearm after having been convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. § 922(g)(9). (ECF No. 1.)

5

**DISCUSSION**

Defendant's Motion argued the warrantless entry into his home was unnecessary and unlawful, and that all evidence found after the officers' entry must be suppressed as fruit of the poisonous tree. (ECF No. 36 at PageID 53–54.) Defendant argued he did not consent to the search of his home and that exigent circumstances did not warrant entry into the home because the home's door was open and "the officers' suspicions could have been dispelled at the threshold." (*Id.* at PageID 54.)

The Report concludes that the officers' warrantless entry into the Lamphier residence was justified pursuant to the exigent circumstances exception to the warrant requirement because the officers reasonably believed somebody inside was either being harmed or threatened with imminent harm. (ECF No. 63 at PageID 84–85.) The Report also concludes that the officers were justified in patting down Hearn for officer safety and were justified in searching the house for individuals who might need immediate medical attention or protection from imminent harm. (*Id.* at PageID 87–88.) Finally, the Report concludes that Hearn's statements to the officers did not raise *Miranda* concerns because (1) Hearn's initial statements about the firearm were made spontaneously, and (2) Hearn was not subject to custodial interrogation in any event. (*Id.* at PageID 90–91.)

Defendant's objections to the Report focus only on the Chief Magistrate Judge's conclusion that the pat down of Hearn was justified. (*See* ECF No. 66 at PageID 94–95.) Defendant argues that based on the "collective knowledge" rule, Officer Tracy and Officer Barnes "collectively had the requisite information that Hearn was not armed and dangerous," based on Ms. Harden's statement to the police dispatcher, even though it is undisputed the dispatcher did

not relay that information to the officers. (*Id.*) Defendant then concludes that Defendant's spontaneous statement about the weapon must be suppressed as fruit of the poisonous tree. (*Id.*)

Defendant's objections attempt to argue application of the "collective knowledge" rule in a manner that, based upon this Court's research, it has never been applied. Under the collective knowledge doctrine, a court may look to the collective knowledge of all officers involved in the criminal investigation even though not all of the information obtained by the investigating officers may have been communicated to the officer who actually undertakes the constitutionally challenged action. For example, a detaining officer who is not personally aware of all the facts on which a reasonable suspicion might be based may nevertheless properly detain an individual on the basis of a direction or information transmitted by police officers who were personally aware of such facts. This principle was illustrated in *United States v. Hensley*, 469 U.S. 221 (1985), where one law enforcement agency relied on the work of another law enforcement agency, the Supreme Court endorsed the collective knowledge doctrine. In *Hensley*, an officer with the St. Bernard Police Department had a reasonable suspicion that the defendant was involved in a robbery. (*Id.* at 223.) The department distributed a "wanted flyer," which advised other law enforcement agencies that the defendant was wanted for robbery. (*Id.*) Officers with the Covington Police Department, who had received and relied on the flyer, stopped the defendant. (*Id.* at 224.) The Covington officers did not themselves have a reasonable suspicion that the defendant was involved in a robbery. (*Id.* at 225.) Even though the Covington officers did not themselves have a reasonable suspicion, the Court concluded that the stop was lawful, because the officers relied on the flyer, and the author of that flyer had a reasonable suspicion that the defendant was involved in a robbery. (*Id.* at 233–36.) "[I]f a flyer or bulletin has been issued on the basis of

articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer justifies a stop[.]" (*Id.* at 232.)

Here, Defendant attempts to argue that the inverse of what the collective knowledge doctrine allows should also be true—knowledge of one law enforcement official (the police dispatcher), even when not communicated to another law enforcement official (the responding officers), can negate reasonable suspicion. This is misguided.

Moreover, even if the police dispatcher had communicated to the responding officers that Ms. Harden reported there was no weapon involved, the surrounding circumstances still justified the officers frisking Defendant for officer safety purposes because, under the circumstances, a reasonably prudent person would be warranted in believing that his or her safety was in danger. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). The Court observes that an officer does not have to be "absolutely certain that the individual is armed" before he can conduct a pat down but must simply be "warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The officers were responding to a call involving a domestic dispute, which often involves highly volatile circumstances. Further, the officers were told that Defendant had just been released from jail for domestic violence, and this was the same residence where Officer Tracy had responded to a domestic violence call a month earlier and had observed blood on the doorstep and outside the bathroom. Finally, when the officers arrived on the scene, they heard what sounded like yelling and slapping coming from inside the residence.

Accordingly, because the "collective knowledge" doctrine does not apply to negate reasonable suspicion and because the officers were justified in patting down Defendant for officer safety in any event, Defendant's statements are not subject to suppression as fruit of the poisonous

tree. Defendant's objections are **OVERRULED**, and the Court **ADOPTS** the Report's proposed conclusions of law.

## **CONCLUSION**

For the reasons set forth above, Defendant's objections to the Report are **OVERRULED**. The Court **ADOPTS** the Report's proposed findings of fact and proposed conclusions of law, and Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED**, this 20th day of May 2021.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE